UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD T. HYDE and | : |
| DENISE B. HYDE | : |
|    *Plaintiffs*, | : |
| | :    3:18-CV-00031 (VLB) |
| v. | : |
| | :    December 4, 2018 |
| ALLSTATE INSURANCE COMPANY and | : |
| LIBERTY INSURANCE CORPORATION | : |
|    *Defendants.* | : |

## MEMORANDUM OF DECISION GRANTING ALLSTATE'S MOTION TO DISMISS [DKT. 36]

Before the Court is a Motion to Dismiss from Allstate Insurance Company ("Allstate") in yet another concrete decay case. Decades ago, a number of homes in Connecticut were constructed with a certain type of concrete which, in certain cases, would suffer from a damaging corrosive chemical reaction. Now, years later, residents are discovering pattern cracking in the concrete of their homes and are seeking coverage of the damage from their insurance companies.

Here, the Hydes made claims with two insurers, Allstate and Liberty, for the damage resulting from the concrete decay afflicting their basement walls. Each company denied the claim, stating that the policies did not cover the claimed loss. The Hydes brought the instant lawsuit alleging breach of contract and violations of CUTPA and CUIPA. Allstate has now moved to dismiss all claims against it, arguing that the Hydes have failed to state a claim upon which relief can be granted in light of the Allstate policy language. The Court agrees for the reasons explained below and accordingly dismisses Counts I and II of the First Amended Complaint.

1

I. **FACTUAL BACKGROUND**

Plaintiffs Richard T. Hyde and Denise B. Hyde (the "Hydes") have owned the residential property at 36 Willow Creek Drive, Tolland, Connecticut (the "Property") since 1998. [Dkt. 29 (First Am. Compl.) ¶ 6]. The residence was built in 1997. *Id.* Between 1998 and 2014, the Hydes insured the Property via Allstate homeowner's insurance policies (the "Policies"), which automatically renewed annually. *Id.* ¶¶ 7-8. The relevant terms of the policies from 1998 to 2014 remained the same.[1] *See* [Dkt. 36-1 at n.1].

In the fall of the 2016, having decided to pursue selling their home, the Hydes hired an engineer to confirm that the Property was not afflicted by the concrete decay issues they had seen in the media in Connecticut. *Id.* ¶¶ 9-10. The engineer found that the Property had been constructed with defective concrete, finding "pattern cracking" in the basement walls of the Property. *Id.* ¶¶ 11-12. The engineer told the Hydes that the concrete was likely from the J.J. Mottes Concrete Company and included a chemical compound which, when mixed with the other elements, "began to oxidize (rust) and expand, breaking the bonds of the concrete internally and reducing it to rubble." *Id.* ¶¶ 12-13.

---

[1] A court considering a motion to dismiss may consider "the factual allegations in plaintiffs' amended complaint, which are accepted as true, . . . documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Plaintiffs did not attach the Policies to the original or amended Complaints but referenced them throughout the Amended Complaint. Defendant Allstate attached one of the Plaintiffs' policies to its Motion to Dismiss. *See* [Dkt. 36-2]. As such, the Court considers that Allstate policy, as representative of each of the Policies, in deciding the Motion to Dismiss.

The Hydes allege that "[a]t some point between the date on which the basement walls of the home were poured and the month of December of 2016, the basement walls suffered a substantial impairment to their structural integrity." *Id.* ¶ 15. The Hydes reported the damage to Allstate on May 15, 2017, making a claim for the loss in accordance with the terms of the Policies. *Id.* ¶ 20. By letter dated September 26, 2017, Allstate denied the claim for coverage stating that the Policies did not cover the loss. *Id.* ¶ 21.

The Policies state that Allstate "will cover sudden and accidental direct physical loss" to covered property, such as the Hydes' home. [Dkt. 36-2 (Mot. Dismiss, Ex. A, Allstate Policy) at 28 of PDF]. The Policies further state that they "do not cover loss consisting of or caused by any of the following: . . . rust or other corrosion, mold, wet or dry rot; . . . settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; . . . Planning, Construction, or Maintenance, meaning faulty, inadequate or defective . . . materials used in repair, construction, renovation or remodeling." *Id.* at 29-30 of PDF. Additionally, the Policies specify that they do not cover "[c]ollapse, except as specifically provided in Section I — Additional Protection under item 11, 'Collapse.'" *Id.*

Under "Additional Protection" for "Collapse," the Policies state that they cover "the entire collapse" of a covered building or part of a covered building structure. *Id.* at 37 of PDF; [Dkt. 29 ¶ 22]. But in order "[f]or this coverage to apply, the collapse . . . must be a sudden and accidental direct physical loss caused by one or more of the following: . . . hidden decay of the building structure . . . [or]

3

defective methods or materials used in construction, repair, remodeling or renovation." [Dkt. 36-2 at 37 of PDF]. They further specify that "[c]ollpase does not include settling, cracking, shrinking, bulging or expansion." *Id.*

The Hydes allege that the Property's "basement walls . . . are in a state of collapse, which collapse was the result of a covered cause." [Dkt. 29 ¶ 23]. They further allege that their claimed loss is covered under the terms of the Policies and Allstate's denial of their claim was contrary to the express provisions of said Policies and thus a breach of the Policy contracts. *Id.* ¶¶ 24-26.

The Hydes also allege that Allstate's participation in the Insurance Services Office, Inc. (the "ISO")—"a cooperative organization formed and controlled by its participants for the purposes, among others, of collecting data on the type of claims made, the policy provisions cited for the basis of each claim, the geographic areas in which the claimed damage has occurred, and the action taken by insurers in response to such claims"—in addition to Allstate's handling of the Hydes' and others' concrete decay claims, constitute unfair and deceptive trade practices in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA"). *Id.* ¶¶ 30-47.

Allstate filed the Motion to Dismiss now before the Court, seeking to dismiss both of the claims against it for failure to state a claim. Allstate argues that the clear language of the Policies bar coverage of the Hydes' claimed loss because the damage was not "sudden and accidental," nor is it an "entire collapse," and further because of the specific exclusions for loss caused by cracking, rust, and defectives materials. *See* [Dkt. 36-1 (Mem. Mot. Dismiss) at 3]. The Hydes disagree

and argue that the language of the Policies is ambiguous, and therefore should be construed in favor of coverage. *See* [Dkt. 38 (Opp'n Mot. Dismiss) at 4].

## II. LEGAL STANDARD

To survive a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

The Court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff" when deciding a motion to dismiss. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). A court may, however, "choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

## III. DISCUSSION

Allstate moves to dismiss both claims brought by Plaintiffs against it. The Court will take each in turn.

A. Count I – Breach of Contract

The success of Allstate's motion depends on whether the Hydes have stated a claim for breach of contract—that is, whether they have pled facts sufficient to plausibly find that Allstate breached the Policies by declining to cover the Hydes' concrete decay loss. Numerous courts have analyzed this question in the concrete decay context and with the same exact Allstate insurance policy at issue here and have dismissed the claims against Allstate upon a motion to dismiss finding that the policy precludes coverage. *See e.g., Adams v. Allstate Ins. Co.*, 276 F. Supp. 3d 1 (D. Conn. 2017) (finding that the plaintiff's claimed loss was not an entire collapse and was not sudden and accidental as required in order for coverage to apply); *Agosti v. Merrimack Mut. Fire Ins. Co.*, 279 F. Supp. 3d 370 (D. Conn. 2017) (same); *Andrew v. Allstate Ins. Co.*, No. 3:17-cv-1192, 2018 U.S. Dist. LEXIS 123328 (D. Conn. July 24, 2018) (same); *Clough v. Allstate Ins. Co.*, 279 F. Supp. 3d 387 (2017) (same); *LaJeunesse v. Allstate*, No. 3:16-cv-00937, 2017 U.S. Dist. LEXIS 190344, at *9 (D. Conn. Aug. 31, 2017) (finding plaintiff's claimed concrete decay loss was not a sudden collapse); *Manseau v. Allstate*, No. 3:16-cv-1231, 2017 U.S. Dist. LEXIS 140587, at *15-16 (D. Conn. Aug. 31, 2017) (finding "Plaintiffs fail[ed] to allege that any loss occurred suddenly, that is, temporally abruptly, as required for coverage to apply"); *Miller v. Allstate Ins. Co.*, 279 F. Supp. 3d 381, 385-87 (D. Conn. 2017) (finding plaintiff had not alleged any sudden loss, including a sudden collapse); *Rudeen v. Allstate Ins. Co.*, No. 3:16-cv-1827, 2018 U.S. Dist. LEXIS 45252, at *20 (finding plaintiff's "allegations do not set forth a plausible claim that she has suffered 'a sudden and accidental direct physical loss'"); *Valls v. Allstate*

*Ins. Co.*, No. 3:16-cv-01310, 2017 U.S. Dist. LEXIS 158192, at *10 (D. Conn. Aug. 10, 2018) (finding no plausible allegation of sudden covered loss); *see also Carney v. Allstate Ins. Co.*, No. 3:16-cv-00592, 2018 WL 4539664, at *24 (D. Conn. Sept. 20, 2018) (granting summary judgment for Allstate finding no sudden loss as required by the policy); *Lees v. Allstate Ins. Co.*, No. 3:15-cv-1050, 2017 U.S. Dist. LEXIS 196728, at *17 (D. Conn. Nov. 30, 2017) (same); *Carlson v. Allstate Ins. Co.*, No. 3:15-cv-01045, 2017 U.S. Dist. LEXIS 159155, at *24 (D. Conn. Sept. 27, 2017) (same); *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01150, 2017 WL 706599, at *8 (D. Conn. Feb. 2, 2017) (same). For the same reasons expressed many times over in those cases, the Court finds the same here.

Under Connecticut law, an insurance policy "is to be interpreted by the same general rules that govern the construction of any written contract." *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 372–73 (2008). Any contract "must be construed to effectuate the intent of the parties, which is determined from the language used and interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. City of Hartford*, 303 Conn. 1, 7–8 (2011) (quoting *Remillard v. Remillard*, 297 Conn. 345, 355 (2010)); *see also Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction." (internal quotation marks omitted)).

Where the language of a contract is unambiguous, a court "must give the contract effect according to its terms." *Harbour Pointe*, 300 Conn. at 260 (quoting *Cantonbury Heights Condominium Ass'n Inc. v. Local Land Dev., LLC*, 273 Conn. 724, 734–35 (2005)). A contract is unambiguous when "its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

Where the language of an insurance policy is ambiguous, such language must be construed against the insurance company that drafted the policy. *See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.*, 247 Conn. 801, 806 (1999). However, any ambiguity in a contract "must emanate from the language used by the parties" and "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Murtha*, 300 Conn. at 9. "The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Harbour Pointe*, 300 Conn. at 261 (quoting *Cantonbury Heights*, 273 Conn. at 735).

Allstate argues that Count I fails because the Hydes' claimed loss is not covered by the plain language of the Policies. Allstate argues several bases for this conclusion: first, the restriction of coverage to "sudden and accidental" losses renders the gradual concrete decay damage outside the Policies; second, the

Hydes' claimed loss falls into multiple policy exclusions, including the exclusions of coverage for loss consisting of or caused by cracking walls, rust, and defective construction materials; and third, the claimed loss doesn't meet the requirements for coverage under the limited coverage for sudden and accidental entire collapses.

The First Amended Complaint primarily alleges that the Hydes' loss is covered under the additional protection for collapse. But under any provision in the Policies, the claimed loss would have to be "sudden and accidental" in order to qualify for coverage. The Hydes have failed to allege qualifying "sudden and accidental" loss in accordance with the plain language of the Policies and Count I therefore fails to state a claim.

1. <u>Sudden and Accidental Requirement</u>

In order for loss to be covered by the Policies, it must have been "sudden and accidental." *See* [Dkt. 36-2]. This requirement is highlighted in two critical places in the Policies. First, under "Losses We Cover," the Policies state up front, "[w]e will cover <u>sudden and accidental</u> direct physical loss to property . . ." *Id.* at 28 of PDF (emphasis added). Thus, the Policies explicitly limit coverage to loss that occurred both suddenly and accidentally. Second, the "Additional Protection" for "Collapse" provision again specifies that "[f]or coverage to apply, the collapse . . . must be [] sudden and accidental . . ." *Id.* at 37 of PDF. The requirement is inescapable.

The requirement is also quite clear, necessitating unexpectedness as well as temporal abruptness. As have other courts to consider this question in the

concrete decay context, this Court finds the analysis in *Buell Industries, Inc. v. Greater New York Mutual Insurance Co.*, 259 Conn. 527 (2002), instructive. *See Andrew*, 2018 U.S. Dist. LEXIS 123328, at *12-13; *Lees*, 2017 U.S. Dist. LEXIS 196728, at *14-17; *Valls*, 2017 U.S. Dist. LEXIS 158192, at *13; *Clough*, 279 F. Supp. 3d at 392; *Manseau*, 2017 U.S. Dist. LEXIS 140587, at *10-11*; Miller*, 279 F. Supp. 3d at 385-86; *Adams*, 276 F. Supp. 3d at *4-5; *Carlson*, 2017 U.S. Dist. LEXIS 159155, at *21-24; *Metsack*, 2017 WL 706599, at *7-8.

In *Buell*, the Connecticut Supreme Court analyzed the meaning of the phrase "sudden and accidental" in the context of a pollution exclusion in a commercial general liability policy. *Buell*, 259 Conn. at 536. The *Buell* Court "acknowledge[d] that, the word 'sudden' can be used to describe the 'unexpected nature,' as well as 'abrupt onset,' of the event being described." *Id.* But the court concluded that, in the context of the phrase "sudden and accidental," because "accidental" already included an element of unexpectedness, "sudden" had to be accorded a temporal element to avoid rendering it mere surplussage. *Id.* at 540-41. This Court finds *Buell*'s analysis applicable here and does not find the Hydes' arguments otherwise persuasive.

The Hydes argue that the "sudden and accidental" requirement is ambiguous in the context of the Policies, thus requiring the Court to construe it in their favor. The Hydes argue that *Buell* should not apply here for several reasons. First, they argue that it is inconsistent with the Connecticut Supreme Court's analysis in *Beach v. Middlesex*, 205 Conn. 246, 252 (1987). In *Beach,* the Connecticut Supreme Court considered the meaning of the term "collapse" in the

context of an insurance policy and found it to be ambiguous where not otherwise defined, further concluding that the undefined term could be construed to include coverage for "any substantial impairment of the structural integrity of a building." *Beach*, 205 Conn. at 252. The *Beach* Court declined to follow those courts which had found "collapse" to require a sudden falling in, loss of shape, or flattening into a mass of rubble. *Id.* As the Hydes point out, the *Beach* Court came to this conclusion in part based on the acknowledgement that requiring an insured to wait for a catastrophic event would be economically wasteful. *Id.* at 252-53. Thus, the Hydes argue that requiring temporal abruptness goes against the guidance of the Connecticut Supreme Court.

In its analysis however, the *Beach* Court noted that the insurance company had the opportunity to "define the term to provide for the limited usage it now claims to have intended"—a complete falling in of a structure—emphasizing the ability of parties to modify by contract the meaning of "collapse" if they so choose. *Id.* at 251. Thus, the *Beach* definition of "collapse" is a default rule, rather than a mandate of public policy. *See Agosti v. Merrimack Mut. Fire Ins. Co.*, 279 F. Supp. 3d 370, 379 (D. Conn. 2017). The Hydes suggest that Allstate did not effectively define the term "collapse" so as to require something other than what the *Beach* Court's analysis would allow. [Dkt. 38 at 9-10]. This Court disagrees.

As it was at liberty to do, Allstate took the opportunity to limit coverage for "collapse" in the Policies. In requiring a collapse to be "entire" and "sudden and accidental," Allstate ensured that the broad *Beach* default definition would not apply to its policies. Contrary to the Hydes' assertion, interpreting the Policies to

11

require a temporally abrupt collapse is not at odds with *Beach* because Allstate specifically defined "collapse" to require suddenness. *See Carlson*, 2017 U.S. Dist. LEXIS 159155, at *17 ("Unlike in *Beach* and its progeny, the Policies here unambiguously express an intent to limit coverage to 'sudden and accidental' collapses. Thus, the alternative definition of collapse formulated in *Beach*—a substantial structural impairment—does not apply here.").

The Hydes further argue that Allstate's proffered interpretation of the Policies results in internal inconsistency because "exclusion for all gradually occurring 'collapses' is antithetical to most of the events purportedly covered by the section," pointing out that "the majority of the specifically enumerated perils covered by the 'collapse' provision contemplate damage occurring over a period of time." [Dkt. 38 at 10]. It is true that hidden decay, potential degradation resulting from defective materials, and hidden vermin and insect damage all usually progress gradually. But this does not mean that the collapse itself can be gradual when the Policies specifically require the collapse to be sudden. Rather, it is entirely possible, and indeed required by the plain policy language, that the cause of an eventual sudden collapse would occur and develop over time, hidden from view until such time as the ultimate temporally abrupt collapse takes place.

The Hydes cite to *Dalton v. Harleysville Worcester Mutual*, 557 F. 3d 88, 93 (2d Cir. 2009) and *Kelly v. Balboa Ins. Co.*, 897 F. Supp. 2d 1262, 1268 (M.D. Fla. 2012) in arguing that the collapse provision is rendered ambiguous "where the perils insured against cause the collapse to occur gradually." *See* [Dkt. 38 at 12-13, n.1, n.2].

In *Dalton*, the court found that use of the word "sudden" rendered the term "collapse" ambiguous "where the policy in question defines collapse in a manner which expressly includes conditions that occur only slowly." *Dalton*, 557 F. 3d at 93. But unlike in *Dalton*, the policy at issue in this case, while allowing for coverage of a collapse caused by slowly developing conditions, *specifically requires suddenness* of the collapse. *See Miller*, 279 F. Supp. 3d at 386 (distinguishing the analysis in *Dalton* from the Allstate policy language considered here because it "specifies that collapses caused by 'hidden decay' are covered, but only if they are sudden and accidental").

As for *Kelly*, this Court does not agree that the "inclusion of 'sudden' in the definition of LOSS for a policy that covers insect damage creates an ambiguous policy provision." *Kelly*, 897 F. Supp. 2d at 1268. As already stated, the cause of a collapse may have progressed over time, but it is still very much possible for the collapse itself to happen within a matter of seconds or minutes—suddenly. "That the Policies acknowledge that sudden collapses may result from hidden, gradual processes does not render them ambiguous." *Carlson v. Allstate Ins. Co.*, No. 3:15-cv-01045, 2017 U.S. Dist. LEXIS 159155, at *21 (D. Conn. Sept. 27, 2017).

Finally, the Hydes challenge the import of *Buell* here by emphasizing "the importance of context in interpreting policy provisions," as expressed by the Connecticut Supreme Court in *Lexington Insurance Co. v. Lexington Healthcare Group, Inc.*, 311 Conn. 29, 41-42 (2014). *See* [Dkt. 38 at 14-15]. There is no doubt that "[l]anguage in an insurance contract . . . must be construed in the circumstances of a particular case, and *cannot be found to be ambiguous or*

*unambiguous in the abstract.*"  *Lexington*, 311 Conn. at 42 (internal quotations and brackets omitted).  Indeed, "one court's determination that [a] term . . . was unambiguous, in the specific context of the case that was before it, is not dispositive of whether the term is clear in the context of a wholly different matter."  *Id.* at 42.

But this Court is not blindly adopting the *Buell* Court's conclusion as to the meaning of the "sudden and accidental" phrase without regard for the greater context of the relevant provisions and the Policies more broadly.  The *Buell* Court's analysis of what "sudden" must mean within the phrase "sudden and accidental" is equally applicable in the context of the Policies, as evidenced by the preceding discussion.  That this may "render coverage under the 'collapse' provision a nullity" in the concrete decay context, as the Hydes suggest, *see* [Dkt. 38 at 14], does not change the fact that Allstate has intentionally defined "collapse" in this manner.  The court must read an unambiguous term to mean what is plainly says.  The sudden requirement in the Policies is not ambiguous, and the Court must construe it as the plain language dictates.  *See Adams*, 276 F. Supp. 3d at *6 ("[T]he term 'sudden' is not ambiguous and its use does not render the term 'collapse' in the policy ambiguous.  Under the terms of the Policy, a process of hidden decay does not trigger coverage until a sudden collapse occurs."); *Andrew*, 2018 U.S. Dist. LEXIS 123328, at *13 (finding that "sudden," as used in the phrase "the collapse of a building structure . . . must be sudden and accidental direct physical loss," unambiguously refers to a temporally abrupt event that did not occur here); *Rudeen*, 2018 U.S. Dist. LEXIS 45252, at *19-20

14

(same); *Carlson*, 2017 U.S. Dist. LEXIS 159155, at *19 (same); *Valls*, 2017 U.S. Dist. LEXIS 158192, at *13 (same); *LaJeunesse*, 2017 U.S. Dist. LEXIS 190344, at *9 (same); *Manseau*, 2017 U.S. Dist. LEXIS 140587, at *11 (same); *Cough*, 279 F. Supp. 3d at 392, 393 (same); *Miller*, 279 F. Supp. 3d at 387 (same); *Lees*, 2017 U.S. Dist. LEXIS 196728, at *17 (same).

Because the "sudden and accidental" requirement of the Policies generally, as well as the collapse provision more specifically, unambiguously require temporal abruptness, the Hydes must allege that their claimed loss occurred in such a sudden manner. *See Andrew*, 2018 U.S. Dist. LEXIS 123328, at *16 ("Because 'sudden,' as used in the collapse provision of the Policy, unambiguously means temporally abrupt, Plaintiffs must have plausibly alleged that any collapse occurred abruptly—not merely unexpectedly—for coverage to have applied.").

The Hydes allege that "[a]t some point between the date on which the basement walls of the home were poured and the month of December of 2016, the basement walls suffered a substantial impairment to their structural integrity." [Dkt. 29 ¶ 15]. They further allege that, "[w]hile the process of decay occurs over the course of years, ultimately resulting in substantial impairment of complete degradation, it may cause sudden events throughout the course of decay." *Id.* ¶ 18. They explain that, "[a]s the chemical reaction progresses and the strength of the wall weakens, external forces may cause a series of sudden events where the walls bulge and shift in some increment or pieces of concrete become dislodged and fall to the floor." *Id.* ¶ 19. Thus, the Hydes acknowledge that the concrete

15

decay and deterioration itself was gradual, and not sudden, but claim that the incremental development of the broader damage may have included sudden events, such as shifting, bulging, or cracking. *See id.* ¶¶ 18-19.

These allegations do not serve to plausibly place the Hydes' claimed loss within coverage of the Policies for two reasons. First, as to the additional protection for collapse, the Hydes plainly do not allege that the collapse itself (putting aside whether there actually was a collapse as defined by the Policies) occurred suddenly. Rather, they acknowledge that "the process of decay occurs over the course of years, ultimately resulting in substantial impairment." *Id.* ¶ 18. The plain language of the Policies dictates that it is the "collapse" which "must be sudden," not any "sudden events" that may eventually lead to the collapse. *See Andrew*, 2018 U.S. Dist. LEXIS 123328, at *15 (considering similar facts and the same policy and concluding that the "language makes clear that it is the 'collapse' that must be 'sudden,' not the cause of the collapse"). Thus, they have failed to allege that Allstate was required to cover their loss as a collapse because they have failed to allege that said collapse occurred suddenly. *See id.* at *16 ("Even when the allegations are construed in the light most favorable to them, Plaintiffs have not alleged plausibly that the [concrete decay] damage to their home constituted or resulted from a temporally abrupt collapse."); *Rudeen*, 2018 U.S. Dist. LEXIS 45252, at *17 ("Rudeen has not alleged plausibly that any [concrete decay] damage to her home occurred temporally abruptly."); *Manseau*, 2017 U.S. Dist. LEXIS 140587, at *5 ("Regardless of whether the loss is characterized as a collapse or a chemical reaction, Plaintiffs fail to allege that any

loss occurred suddenly, that is, temporally abruptly, as required for coverage to apply."); *Adams*, 276 F. Supp. 3d at *4 (finding that plaintiffs had failed to allege a sudden collapse); *Miller*, 279 F. Supp. 3d at 386 ("Without any plausible allegation of suddenness, and with allegations that explicitly contradict the possibility that the [concrete] deterioration occurred suddenly, Plaintiff's claim is not plausibly covered by the plain language of the policy."); *Valls*, 2017 U.S. Dist. LEXIS 158192, at *9 (finding that the plaintiffs "have not alleged a sudden collapse" as required by the Allstate policy).

Second, as to general coverage under the Policies, while the Hydes do allege that "sudden events throughout the course of decay" constitute the loss, those "sudden events," when broken down into increments, plainly fall into the Policies' exclusions for "loss consisting of or caused by" "rust or other corrosion," "settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings," and "faulty, inadequate, or defective" materials. *See* [Dkt. 36-2 at 29-30 of PDF]. The "sudden events" cited by the Hydes are described as "bulg[ing] and shift[ing]" of the basement walls, leading "some increment or pieces of concrete [to] become dislodged and fall to the floor." [Dkt. 29 ¶ 19]. But the Policies unequivocally state that they "do not cover" "settling, cracking, shrinking, bulging or expansion," even when such damage occurs "suddenly and accidentally." [Dkt. 36-2 at 29 of PDF].

Attribution of the loss to the corrosive chemical reaction fails as well. The First Amended Complaint describes the process leading to the "pattern cracking" as "oxidiz[ation] (rust)." [Dkt. 29 ¶¶ 12-13]. And the Policies specifically state that

17

they do not cover "rust or corrosion." [Dkt. 36-2 at 29 of PDF]. As such, the plain language of the Policies excludes coverage of such claimed loss.

Nor will attributing the loss to inadequate or defective materials allow the Hydes to succeed. The Policies explicitly bar coverage for losses consisting of or caused by "[p]lanning, [c]onstruction or [m]aintenance, meaning faulty, inadequate or defective" "materials used in repair, construction, renovation or remodeling." [Dkt. 36-2 at 29-30 of PDF]. Thus, even when describing the loss as caused by the defective concrete used in the construction of the basement walls, and even when broken into incremental "sudden events," it is not covered by the Policies. *See* [Dkt. 29 ¶¶ 12-14, 18-19].

Because the Policies only cover loss which has occurred "sudden[ly] and accidental[ly]," which requires temporal abruptness of the loss, and the Hydes have failed to allege that any covered damage occurred "sudden[ly] and accidental[ly]," they have failed to state a claim for breach of contract. Therefore, Count I of the First Amended Complaint is DISMISSED.

Because the Court finds that the Hydes have failed to allege that any covered loss occurred suddenly, that is, temporally abruptly, the Court need not address Allstate's additional arguments as to the shortcomings of the Hydes' allegations of a covered collapse.

### B. Count II – CUIPA and CUTPA Violations

To state a CUIPA/CUTPA claim, Plaintiffs must plausibly allege that Allstate "engaged in an act prohibited by CUIPA's substantive provisions, and that the act proximately caused the harm alleged." *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d

157, 165 (D. Conn. 2014). The relevant provision here is the prohibition of "[u]nfair claim settlement practices" under Connecticut General Statute § 83a-816(6). [Dkt. 29 ¶¶ 43-44].

In Count II of the First Amended Complaint, the Hydes allege that Allstate violated CUIPA and CUTPA by: "misrepresenting pertinent facts or insurance policy provisions relating to coverage at issue in concrete decay cases as part of its general business practice" and "failing to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear as part of its general business practice." *Id.* The Hydes further allege that Allstate used its participation in the ISO—"a cooperative organization formed and controlled by its participants for the purpose, among others, of collecting data on the type of claims made, the policy provisions cited for the basis of each claim, the geographic areas in which the claimed damage has occurred, and the actions taken by insurers in response to claims"—to evade responsibility for losses like the Hydes'. *Id.* ¶¶ 30, 31-36. Thus, as further stated in their Opposition Memorandum, the Hydes' CUIPA/CUTPA violation allegations rest on Allstate's incorrect and unfair interpretation of the insurance policies. *See id.*; [Dkt. 38 at 23 (arguing that their allegations that "Allstate denied their claim in bad faith," "provided a knowingly false and misleading reason for the denial of coverage," and "similarly denied coverage" in five other cited cases, "properly plead a claim that Allstate engaged in conduct proscribed by CUIPA.")].

However, "[w]here an insurer's interpretation of an insurance policy is correct, there can be no violation of CUIPA/CUTPA." *Manseau*, 2017 U.S. Dist.

LEXIS 140587, at *17 (citing *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 378 (2008)).  Indeed, if Allstate did not improperly deny claims, as the Court has now determined, the Hydes' claim, which is premised on the bad faith denial of claims, must fail.  The Hydes' ISO membership related arguments also fail to support their claim because there is a lack of causation—even assuming Plaintiffs' allegations are true, any collusion by Allstate with other insurance companies did not result in the denial of coverage because the policy did not cover the loss in the first instance.  Thus, because Allstate's interpretation of the Policies was correct, as discussed *infra* at Section A, the Hydes' CUIPA/CUTPA claim against Allstate cannot stand and Count II is DISMISSED.

## IV. CONCLUSION

For the reasons set forth above, Allstate's Motion to Dismiss is GRANTED and Counts I and II of the First Amended Complaint are DISMISSED.  Being that the only two claims against Defendant Allstate are dismissed, the Clerk is directed to DISMISS Allstate as a Defendant from the case.

IT IS SO ORDERED.

                                                   /s/

                                         Hon. Vanessa L. Bryant
                                         United States District Judge

**Dated at Hartford, Connecticut: December 4, 2018**